UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THEODORE SORIA, | No. 2:18-cv-1218 CKD P |
| Petitioner, | |
| v. | ORDER |
| KATHLEEN ALLISON,[1] | |
| Respondent. | |

Petitioner is proceeding pro se with a petition for writ of habeas corpus under 28 U.S.C. § 2254. The parties have consented to this court's jurisdiction pursuant to 28 U.S.C. § 636(c) and Local Rule 302.

Following a Sacramento County jury trial concluding December 20, 2011, petitioner was found guilty of rape of an unconscious woman and rape of an intoxicated woman. ECF No. 12-16 at 122. Petitioner was later sentenced to a term of 11 years imprisonment. Id.

Petitioner raises 3 claims. For the reasons which follow, the petition for a writ of habeas corpus will be denied.

/////

---

[1] California Department of Corrections and Rehabilitation (CDCR) Secretary Kathleen Allison is hereby substituted as the respondent in this action pursuant to Rule 2(a) of the Rules Governing Section 2254 Cases. It appears that petitioner is on parole from a sentence he served in CDCR.

I. Background

On direct appeal, the California Court of Appeal summarized the evidence presented at trial as follows:

> Prosecution's Case–in–Chief
>
> On Saturday, November 28, 2009, around 8:00 or 9:00 p.m., the 44–year–old defendant was home, drinking beer, and playing video games, when his son Theo brought home three friends and a large bottle of vodka. The group of four—all of whom were about 20 years old—consisted of defendant's son, the son's new girlfriend, Karolyn Hawley (Karolyn), the son's friend, Heriberto Corral (Beto), and Beto's girlfriend, J.W., who is the victim. They planned to get drunk. They started drinking the vodka with juice or soda in the son's bedroom. Defendant stayed in the living room, but someone brought him some vodka. The four young people mainly stayed in the son's bedroom but came out on occasion. For example, the victim came out for ice and Karolyn smoked marijuana with defendant in the living room. The victim did not smoke any marijuana.
>
> The victim, who liked to get drunk and had previously blacked out from binge-drinking, drank four or five drinks, got drunk and dizzy, and vomited in the bathroom. Beto and Karolyn helped the victim to the bedroom of defendant's daughter, Sophia, who had come home earlier but left to sleep at a friend's house. The victim vomited in Sophia's bedroom, perhaps in a garbage can. Karolyn testified that she asked defendant for a "ratty shirt that he didn't really care about that she could sleep in." The reason she asked for the shirt was because she thought it would be uncomfortable for the victim to sleep in her clothes, but she told defendant she wanted the shirt for the victim because "she was sick." According to Karolyn, defendant went to his room, obtained a black shirt, and gave it to her. Karolyn brought the shirt to the victim in Sophia's room, said to change into it, and left the room. The victim fell asleep or passed out on top of the bedcovers, fully clothed. Karolyn and defendant's son fell asleep around midnight in the son's room. Beto stayed up playing a video game with defendant.
>
> Around 2:30 or 3:00 a.m., the victim awoke. Her vagina was sore and wet. She was under the bedcovers, wearing only her underwear. Her clothes were on the floor by the bed, as were defendant's slippers.[2] The victim did not see any other article of clothing that belonged to defendant in the room. The victim found Beto asleep on the living room couch. She woke him and asked if they had "messed around." He said no. The victim became scared and said she thought defendant did something to her. The victim and Beto woke up Karolyn and defendant's son, who said his father would not do anything sexual like that. The four talked and eventually fell asleep

---

[2] Defendant did not allow people to wear shoes in the house. He kept his slippers by the front door for anyone to wear, but the victim had never seen her friends wear the slippers, and Karolyn recalled seeing defendant wearing the slippers earlier in the evening.

in the son's room. They awoke around 11:00 a.m. and went out to eat. The victim went home and showered.

Later, the victim returned to defendant's home to meet up with Beto. She saw defendant but did not interact with him. She saw Sophia, who was holding defendant's shirt in her hand and asked the victim what happened. Sophia noticed hickeys on the victim's neck. Beto said he was not responsible for the hickeys. Sophia revealed she had once been raped when drunk and that the victim should tell someone. At trial, the victim for the first time stated that Sophia said her father had "hit on" her friends in the past.

After Sophia and the victim spoke, Sophia asked defendant, in the victim's presence, why his shirt was in her bedroom. The victim testified defendant replied he brought the shirt to the victim because she was cold. The victim had no recollection of him bringing her a shirt.

Later that night, November 29, 2009, the victim told her mother what happened after Beto said he would tell unless the victim told. The three went to the hospital, where they spoke to a police officer who took them to UC Davis Medical Center, where the victim underwent a sexual assault examination.

The victim testified that after the night in question, she continued to visit defendant's home until she and Beto broke up in February 2010. Defendant did not act any differently toward her during these visits.

Karolyn, who did not believe defendant would ever take advantage of a drunk woman for nonconsensual sex, testified that the defendant did not treat the victim any differently when the victim visited the house after the night in question, and the victim did not seem uncomfortable around defendant during that time. Karolyn, who had been 19 years old at the time, testified that on that night at defendant's home, while she and defendant were smoking marijuana in the living room, she leaned over, exposing her breasts, and defendant said, "nice rack," which she took as a compliment. Defendant had told both the victim and Karolyn that they were pretty. Karolyn testified she broke up with defendant's son in February 2010. She and defendant remained close platonic friends, going to the gym or lunch together or talking on the phone, but they did not talk about the case. Karolyn was not friends with the victim.

In April 2010, the victim, in the presence of a police detective, made a pretext phone call to defendant, which was tape-recorded and played for the jury. Defendant greeted her pleasantly, asked how she was, and said he had not seen her in awhile. She said she was "pretty good" and wanted to ask him "[a]bout that night I was over at your house, and it was Theo, me, Beto [] and Karolyn, and we were drinking with—in Theo's room. I had somebody rape me, but I didn't really know who and I—I mean, I—your shirt and your slippers were in Sophia's room, so I thought—and I'm pretty sure that you had sex with me and I want to know why." The following ensued:

/////

3

1  "[Defendant]: Real—really?

2  "[Victim]: Yeah.

3  "[Defendant]: Well, here let me sit down 'cause this is the first I've heard of this. Hold on. Let me go in the other room. Hold on. [Footnote omitted.] Okay. I'm in shock right now. So, anyways, so what happened?

4

5  "[Victim]: Why—I—why did you have sex with me while I was passed out?

6

7  "[Defendant]: You know, I don't remember that—that happening. I don't remember that at all. And I—this is the first I've heard of this, and it's—I don't know what to say. I'm shocked and sorry to hear that.

8

9

10  "[Victim]: But your shirt was on the floor, on the bedroom floor by Sophia's bed.

11  "[Defendant]: Is that the shirt that Sophia gave me? Because I remember Karolyn giving me—coming up to me and asking me for a shirt, and I gave her a—a—a black one. That's all I remember.

12

13  "[Victim]: Oh, well, that's the one that I—that was on the floor as well as your slippers.

14

15  "[Defendant]: And I don't know about my slippers and stuff. I don't know what happened with that.

16  "[Victim]: I don't know. I woke up and they were by the bed.

17  "[Defendant]: I don't remember any of that. I—I—I—all I remember is I was passed out in the living room, and Beto woke me up and he told me to get out of there, and so I went to my room and that's all I remember.

18

19

20  "[Victim]: Well, I know someone had taken my clothes off because when I woke up, I didn't have them on, and when I fell asleep, they were on.

21

22  "[Defendant]: Hum.

23  "[Victim]: So I don't—

24  "[Defendant]: I don't know what to say other than I'm sorry. I don't remember any of that.

25  "[Victim]: I don't really remember. That's why I was calling to ask.

26  "[Defendant]: I don't remember either. I just feel bad now. I mean, I've always respected you and I—I always thought you were attractive, but I don't remember ever carrying out anything like that.

27

28  /////

4

"[Victim]: Well, I know I had sex, and I know it was you. It had to be.

"[Defendant]: I don't remember. I—I would have to trust your word on that and say sorry 'cause I don't remember anything like that. I'm sorry, [J.]. And I—I really don't remember anything like that. I just—I just apologize. If I did that, then I'm sorry."

The conversation continued in the same vein. The victim asked if defendant had used protection, and he said he did not remember any of that night, other than waking up around 5:00 or 6:00 a.m., when "you guys" left and later came back. The victim said Beto said it happened. Defendant expressed surprise and said Beto never mentioned a word to him.

The victim said she thought defendant was lying. Defendant said he was sorry she felt that way. He woke up with all his clothes on in his own bed and "I don't know. Honestly I don't know. I just—I—I—if this all happened like you said, then I—I totally regret my actions, and I apologize whole-heartedly. I don't remember any of that." The conversation continued:

"[Victim]: Do you think I'm attractive?

"[Defendant]: I always have, yeah. I just wish I was more in shape and had money and stuff. I think probably I would think (unintelligible) might be a little bit different if I was to ever ask you out. But you were with Beto, so I never even thought of it. [¶] But, yeah, I've always thought you were attractive. Still do. I just—I don't remember any—doing anything stupid like that."

"[Victim]: Well, why would you do that if I was passed out?

"[Defendant]: "I don't know. I can't explain my actions if that happened that night like that. I don't remember. I don't remember at all. I'm sorry. I just remember being hella drunk 'cause I remember I was taking hits off that bottle besides drinking that beer. [¶] In fact, the last thing I remember is Beto waking me up when I was passed out on the living room floor still playing the video game. [¶] . . . [¶] I remember all of us drinking and stuff. And I remember Karolyn. I do remember Karolyn trying to make you smoke out of the bong. I remember that. And I remember saying, don't—you know, don't do it if you don't want to. [¶] Let's see what else I remember that night. I remember playing video games. I remember all you guys went inside Theodore's room, and that's about all I remember."

The victim asked if defendant was sorry. He said, "of course I am. I don't want it like that. I've always liked you and stuff, and, you know, I don't want it to be like that. I wish I would have talked to you about this sooner. I didn't know. I swear." The victim asked about protection. He said he did not remember, but "if you're worried about anything," he was tested in January when he got into "that other relationship" and was "totally clean."

/////

5

After more of the same equivocal apologies "if it happened," defendant asked why the victim was calling now. She said she had a nightmare about it. She asked:

"[Victim]: Why did you do this?

"[Defendant]: I honestly don't know. I don't know. I—the only thing, like I said, is I've always thought you were pretty and attractive, and I've always liked you as a person. I've always respected you. I think you got your head on your shoulders, and I think Beto's stupid. You know? That's what I thought—always thought about you. I never thought about anything else like that."

The victim said, "I need you to say you're sorry." Defendant said, "I am. I'm sorry. I'm sorry. I just don't remember any of that. . . ." The victim said she thought he was lying. Defendant said he was sorry she felt that way. The victim finally ended the call.

The victim testified she did not really remember defendant being on top of her, as she stated during the pretext call at the detective's prompting. She was not attracted to defendant and felt "grossed out" when he said he was attracted to her.

A nurse testified she performed the sexual assault examination on the victim. The victim said she had not had intercourse within the previous five days. The nurse did not notice any bleeding, trauma, or other physical injury, but sexual assault victims commonly present without injury or trauma. Even unconscious, the body can lubricate and have a sexual response. The examination revealed nothing inconsistent with consensual sexual intercourse. The nurse did not observe any sperm on genital swabs under the microscope but forwarded them for DNA testing. However, the nurse did observe an approximately two-centimeter hickey on the victim's neck.

A criminalist testified she detected sperm in the vaginal, cervical, and anal swabs taken from the victim. The vaginal and cervical swabs had high concentrations of sperm, while the anal swab had a low concentration, which led the criminalist to opine that the sperm from the anal swab was probably drainage from the vagina rather than evidence of sodomy.

Ryan Nickel, a criminalist with the Sacramento County District Attorney's office, testified as a DNA expert. He analyzed a vaginal swab [footnote omitted] first separating a sperm fraction from the victim's epithelial cells, which are the cells lining body cavities. Taking a small portion of the sperm fraction for DNA testing, Nickel obtained a DNA profile from it and compared it to buccal reference samples obtained from defendant, defendant's son, and Beto. Nickel was able to exclude defendant's son and Beto as the major profile contributor of the sperm fraction.

Nickel compared the sperm fraction with defendant's buccal swab sample at the standard 15 locations and testified they matched at 14 locations. At one location, locus D–5, there were three alleles instead of the standard two. Two of these alleles were the same as

6

defendant's profile at the D–5 locus, as were the alleles at the other 14 locations. One allele at D–5 was not consistent with defendant's profile. Thus, Nickel concluded, "[t]he major profile from the sperm fraction is the same as [defendant's] reference profile. And the reason I said the major profile is because we have a location . . . at D–5 where a minor allele was detected. And I called this in my report as carryover from the [epithelial] cell fraction. . . . [The victim's] profile is a 12, 12. And that is consistent with that minor allele being carried over to that sperm fraction." Nickel explained that the differential extraction process "isn't a 100 percent efficient process." Carryover occurs when the sperm cells are not separated from all of the epithelial cells in the extraction process and, for example, some of the epithelial cells are in the sperm fragment. This kind of carryover is "pretty common" and Nickel had seen it on "multiple occasions." The third allele was a 12, and the victim was a 12 at that location. Nickel opined that "the most likely explanation, which we see at the laboratory when we do differential extractions all of the time, is carryover."

Nickel testified that there are two other possible explanations for the third allele at D–5. One is that the profile includes a tri-allele. A tri-allele is a very rare phenomenon, but Nickel has occasionally observed them. If the "12" allele at locus D–5 is part of a rare tri-allele, then the DNA profile for the sperm fraction does not match defendant's DNA from the buccal swab, because defendant's DNA from that swab has no tri-alleles at any locus. Nickel said the third allele could be explained by a mutation, though he found no mutation when working on the case, and his notes made no mention of a mutation. Nickel indicated there was no way of knowing if it were a tri-allele belonging to defendant without obtaining a semen sample from defendant for comparison. [Footnote omitted.] Nickel testified defendant's semen sample could be different from his buccal sample by a tri-allele. Semen samples are not ordinarily collected by law enforcement, but the defense could have obtained a sample of defendant's semen and tested it. Nickel said that characterizing the results as a tri-allele would not exclude defendant, despite the absence of a tri-allele in defendant's DNA profile at locus D–5.

Another explanation for the third allele reading of "12" at locus D–5 could be that it came from an unknown male contributor or Beto. Beto has a "12" allele at D–5, so it was possible that it was a carryover from Beto. However, had the third allele been Beto's, Nickel would have expected to see other alleles matching Beto's profile. Nevertheless, he could not include or exclude Beto as being the contributor of that allele.

On cross-examination, Nickel agreed there was "no scientific basis" for his opinion that the third allele was carryover from the non-sperm fraction. "I didn't determine that it was—but I've seen it in multiple occasions that this crossover does occur, so I decided to call it as a 12 from carryover." Nickel was not aware of any cases documenting a 14–loci match in samples from different people.

Nickel acknowledged that laboratory protocol requires repeating the differential extraction process if epithelial cells are detected in a

7

sperm fraction, but he did not do so because he saw no epithelial cells in the small representative sample from the extraction he examined under the microscope. When asked to explain how he could characterize the third allele at locus D–5 as carryover from the epithelial portion of the sample if the differential extraction process was properly performed, Nickel said, "I'm saying there's no way to determine that minor allele at the D–5 location, there's no scientific basis to determine if it's carryover, triallele or another individual." Nickel's opinion that the third allele was carryover, was based on his professional wisdom gathered from his work, training, experience, and talking to colleagues.

Nickel provided several reasons why he decided to characterize the third allele as carryover from the nonsperm fraction. He said he had seen "in multiple occasions that this crossover does occur." He would expect to see additional alleles at other locations if there was more than one sperm contributor to the vaginal sample. The absence of additional alleles at other locations led him to form the opinion that the additional allele was a carryover from the victim's DNA profile. Thus, despite the other possibilities, based on his training and experience, Nickel opined that defendant was the major DNA contributor of the sperm fraction from the victim's vaginal swab.

Using the FBI statistical program, Nickel testified the statistical frequency of occurrence of the same DNA profile as defendant, who does not have an identical twin, would be one in two sextillion African–Americans, one in nine quintillion Caucasians, and one in one quintillion Hispanics. [Footnote omitted.]

Defense Case

Michelle Okazaki testified she and defendant had been dating since 2007, exclusively, "[f]or the most part," seeing each other "at least once a month" until 2010. She did not hear from him for a long time and assumed he lost interest. She later learned he had been arrested. Eventually, in 2011, he told her about the victim's accusation. Although Okazaki did not know about the accusation until 2011, she testified she saw the victim and Beto at defendant's home a couple of weeks after the night in question, and the victim was comfortable around defendant and even wanted to spend the night at his house rather than ride her bicycle or accept Okazaki's offer to drive her home. Okazaki did not believe defendant would ever take advantage of an intoxicated woman and commit a nonconsensual sex act.

Melissa Tiner testified she and defendant knew each other for 14 or 15 years, were best friends, and dated on and off for several months. On the day after the night in question, she picked up defendant for lunch. She had never seen him more hung over. She did not think he would take advantage of a young intoxicated woman and commit a nonconsensual sex act.

Two of Sophia's friends testified they had been around defendant when he was drunk and when he was sober and did not believe he would ever take advantage of a young intoxicated woman and commit a nonconsensual sex act.

Beto testified that he and the victim both got drunk that night. He had never seen her that drunk. However, he saw her drunk on many occasions, sometimes so drunk that she later had no memory of what she did. Beto checked on the victim after she went to Sophia's room but did not recall whether her clothes were on, but he recalled that she was under the covers. Around midnight, Beto went out to get some food. When he returned, no one was awake. He woke up defendant, who was "passed out" asleep on the living room floor, and told him to go to bed. Defendant replied he was not sleeping and resumed playing video games. Beto watched defendant playing the video games until Beto fell asleep on the couch. At some point, Beto heard defendant walk toward his bedroom, which is on the opposite side of the house from Sophia's room. At some point thereafter, the victim awakened Beto and asked if they had had sex. He said no. She kept asking if he was certain. Eventually, she asked if he thought defendant might have done something to her. When Beto asked why, she said she woke up naked and defendant's slippers were by the bed.

After that night, Beto and the victim continued to hang out at defendant's house, though the victim said she did not want to go there anymore. On one occasion, they rode bikes to defendant's house, and defendant gave them a ride home. Beto did not recall the victim wanting to stay the night or Okazaki offering a ride home.

Sophia testified defendant was wearing socks on the night in question and did not usually wear slippers with socks. She said she remembered he was wearing socks because "he had a hole in them." However, she also admitted she previously testified she had no reason to pay attention to what defendant had on his feet. When Sophia returned the next day, her bed was unmade and defendant's shirt was on her floor. She asked her brother and Beto why, and they told her what the victim said about waking up with a sore vagina. When the victim returned, the victim confided the same thing to Sophia, who related that she had been raped in high school, and encouraged the victim to speak with someone. Sophia asked defendant why his shirt was in her room. He said Karolyn wanted the shirt because someone was vomiting. Sophia testified defendant did not remember who was vomiting. "He was kind of all over the place. Somebody needed a shirt kind of thing." Sophia was concerned that defendant's shirt and slippers had been in her room. She checked the bedding for secretions but did not see anything. She set aside the bedding in case the victim later remembered anything, but when the victim came over the next day, Sophia washed the bedding because she did not think the victim would come back if defendant had raped her. Sophia never asked defendant about what the victim had said. Sophia testified her father was respectful of her privacy. None of her friends ever complained about defendant hitting on them, and she did not believe he would ever take advantage of a young intoxicated woman and commit a nonconsensual sex act.

Defendant's son did not testify.

Dr. Gregory Sokolov, a psychiatrist, testified as an expert witness on Ambien. He said Ambien is a sedative prescribed for insomnia. Most patients take it right before they go to bed. Patients with

9

anticipatory anxiety about another sleepless night may take it earlier. It is not prescribed for depression, but some patients take both Ambien and an anti-depressant. Ambien is not recommended for anxiety, but some doctors prescribe "off label." Ambien has a very rare side-effect in that it can cause a sedated hypnotic intoxicated state, during which the patient engages in complex behavior while unconscious of the act, with little or no memory of it later. The behavior includes sleepwalking, sleep-eating, sleep-sex, and sleep-driving. Mixing alcohol with Ambien increases the risk of this complex behavior. Around 2006 or 2007, the federal government required the drug maker to warn doctors of this side-effect. Responding to a hypothetical question involving nonconsensual sex imposed upon another person by a person who took Ambien, drank 60 ounces of beer and four to five vodka cocktails, smoked marijuana, and had no recollection of having sex, Dr. Sokolov opined that the conduct "could be consistent with a sedative hypnotic intoxication and/or complex behavior event," and from a psychiatric medical perspective, such conduct would be involuntary.

Defendant testified. He planned to spend the evening alone on his living room couch playing with his Xbox. He took an Ambien around 4:00 or 5:00 p.m., before he went to the store and bought a video game, a headset, and beer. Defendant testified he got a prescription in 2006 to take Ambien as needed to help with anxiety, stress, depression, and insomnia. He had taken Ambien for a couple of nights before this incident due to stress from being laid off from his job. Ambien sometimes puts him to sleep, but he did not care if he fell asleep because he bought the game rather than renting it and could play it whenever he wanted. Defendant did not learn of the potential rare side effect of Ambien until a prior hearing when the doctor testified.

As defendant was getting his game set up, he received a phone call from the victim and Beto, wanting to come over. He reluctantly agreed. His son came home with Karolyn, and the victim and Beto arrived with a large bottle of vodka and some mixers. The four young people mainly stayed in his son's bedroom and went back and forth to the kitchen. Karolyn wanted to smoke marijuana, so she and defendant smoked marijuana in the living room. The two young men moved back and forth between the son's room and the living room to check out the video game defendant was playing. The victim offered defendant vodka and orange juice, and he accepted. He accepted offers of refills and drank "around five-ish" vodka drinks that night.

The victim got drunk and loud. Defendant heard someone urging the victim to lie down. He heard sounds like someone was vomiting. He did not try to help, because it had happened before, and the girls usually take care of it. Defendant testified that he had a vague recollection of Karolyn asking him for a shirt, and he gave her one. He had previously testified that he had just washed clothes and obtained the shirt from the laundry.

The last thing defendant remembered from that night is Beto helping him up off the floor and into defendant's bedroom, though Beto

10

contradicts it. The next thing defendant remembered is getting a phone call the next morning around 11:00 a.m. from his friend Melissa about a planned lunch with her he had forgotten. He awoke with the worst hangover of his life. He did not have the burning sensation that he gets after sex and there was no other indication he had had sex the previous night. He was fully dressed as he had been dressed the night before. Defendant was wearing a T-shirt, hooded sweatshirt, sweat pants, and socks. That he awoke clothed was significant to him because he takes off his clothes when he has sex and he did not remember taking off his clothes that night. He keeps slippers out for going outside or for women who complain about his rule against wearing shoes in the house. He does not normally wear his slippers around the house but does so on occasion. He testified he does not know how his slippers got into Sophia's room. Nor does he know how his sperm got into the victim's vagina.

When defendant returned home from having lunch with Melissa, the victim and the others were playing a video game. The victim acted completely normal, continued to hang out at defendant's home, continued to interact with him as usual, and never said anything about defendant having sex with her. On one of those visits, the victim told Michelle that she, the victim, did not want to go home. About four or five weeks after the night in question, the victim stopped coming to defendant's home.

About three or four months after the night in question, defendant received the phone call from the victim accusing him of rape. He was shocked. He did not deny it, because she was a friend, he did not remember anything from that night, and he "had no reason to disbelieve her." He apologized to be polite and let her know he was sensitive. His daughter went through something like that and he wanted to make sure the victim knew he was concerned about her well-being. He told her he was attracted to her to be kind. He testified, "I was in fear of what was going on as far as her saying that I raped her and so I thought it was the best thing to ease the situation. So being as polite as possible I said that as far as to pretty much defuse the situation because I was clueless on what was going on at that point in time because no one said anything."

Defendant was angry with Beto for not alerting defendant to the victim's allegation, but defendant and Beto later reconciled.

Defendant testified his ex-wife complained he had difficulty performing sex acts when drunk.

Defendant admitted complimenting Karolyn's breasts. When she asked for marijuana, she leaned over, and one breast fell out in front of his face. He was uncomfortable and did not know what to say, so he paid her the compliment, and she laughed, put her breast back in her blouse, and they never spoke of it again. When asked if he would joke with women about sex, he said, "I've been inappropriate, but I wouldn't cross the line and touch nobody."

Defendant testified he does not believe he had sex with the victim. When asked on direct examination, "You heard the DNA evidence

11

in the case?" defendant answered, "Yeah, I have to accept that." He testified, "I have no memory of anything that night. Nothing. Anything of having sex. Nothing. I don't remember nothing like that." When asked if he believed himself capable of taking advantage of a young intoxicated woman without her consent, he said, "No, absolutely not. And all my daughters' friends have partied with me, they've slept on the couch along side with me and there's been no incidents ever since I was even in college ever, anything accusation [sic ] like this. No."

Before this incident, the victim stayed overnight on her first visit to defendant's home; she and two of her girlfriends slept on defendant's bed, and he slept on the couch.

Prosecution Rebuttal Case

Sacramento Police Department Officer James Sobodash spoke with Beto at the hospital when the victim was there for the sexual assault examination. Beto told Sobodash that he went to Taco Bell around 11:30 p.m. The victim had been put in Sophia's room earlier. When Beto returned around midnight, he checked on the victim. She was covered by a blanket and was wearing her yellow and gray long-sleeved shirt. Beto woke up defendant and watched him play a video game until Beto fell asleep. Beto was awakened by the victim around 2:30 a.m., and she told him about her suspicions. She mentioned that defendant's slippers were by the bed. Beto asked to see them and the victim went into Sophia's room and came out with the slippers. Beto said he started to freak out at that point.

Later in the day, when Sophia was talking to the victim, Sophia asked defendant why his shirt was in her bedroom. According to Beto, defendant said the victim had asked for the shirt because she was sick. The victim whispered to Beto that she had never asked defendant for a shirt.

Beto told Sobodash that the first time defendant met Karolyn he told her, "Wow, you have a perfect pair of tits, you know that?"

ECF No. 11-5 at 3-20.

II. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ of habeas corpus is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.2d 1146, 1149 (9th Cir. 2000).

/////

/////

Title 28 U.S.C. § 2254(d) sets forth the following limitation on the granting of federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

/////

13

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011).

The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

III.  Petitioner's Claims

    A.  Insufficient Evidence

In his first claim, petitioner asserts there was not sufficient evidence presented at trial to sustain his convictions. Evidence is constitutionally sufficient to support a jury's finding if when, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

The last reasoned decision with respect to petitioner's insufficiency of the evidence claim was issued by the California Court of Appeal on direct appeal. After recognizing the appropriate standard from Jackson, the Court of Appeal found as follows:

> Here, the combination of the DNA evidence and other circumstantial evidence was sufficient to support the judgment. The DNA testing of the sperm fragment from the vaginal swab matched defendant at 14 loci. It is uncontroverted that the major profile is not Beto and it is not defendant's son. That leaves the only other male in the house, defendant. Unless there was some unknown male at the house who had intercourse with the victim who had the exact same profile at every location except one, where a potential triallele is located, then it must have been defendant who was the perpetrator. Nickel was not aware of any cases documenting a 14-loci match in samples from different people. Nor did defendant introduce any evidence indicating as much.[3]
>
> There was also non-DNA evidence. Defendant's slippers were found next to the bed, as were the victim's clothes, and when the victim went to bed, she was fully clothed. Defendant had no explanation for why his slippers were by the bed when confronted with this assertion during the pretext call. His shirt was also found on the floor. When confronted by Sophia about the shirt, the victim remembered that defendant said he brought it to her because she was

---

[3] See *People v. Robinson* (2010) 47 Cal.4th 1104, 1115 [defendant's DNA was analyzed at 13 loci and the prosecution expert testified that there had been no reported cases of two people who are not identical twins matching at all 13 loci].

14

> cold, and Beto said defendant claimed the victim had asked him for a shirt. She had not. The jury was not required to accept the explanation defendant gave for this evidence at trial. Moreover, even at trial, defendant never expressly denied the rape. Instead, he just claimed he did not remember it, even though during the pretext call, which came out of the blue months after the night in question, he remembered other details of that night, e.g., that his son's girlfriend purportedly asked him for a shirt, that he provided her with a shirt, and that the shirt was black; that he took hits off a bottle and also had beer; that he smoked from a bong with his son's girlfriend; that his son's girlfriend tried to get the victim to smoke; that the victim declined the marijuana; that he passed out in the living room while playing the video game; that Beto woke him; that he went to bed in his bedroom; and that he woke up fully clothed. There is sufficient evidence to support defendant's conviction.

ECF No. 11-5 at 30-31

After reviewing all material portions of the record before the court, the court agrees with the assessment of petitioner's sufficiency of the evidence claim put forward by the Court of Appeal. For this reason, and because the Court of Appeal's rejection of petitioner's sufficiency of the claim is not contrary to Supreme Court precedent, it does not involve an unreasonable application of Supreme Court precedent and it is not based upon an unreasonable determination of the facts, habeas relief is precluded under 28 U.S.C. § 2254(d).[4]

B. Sentencing

As indicated above, petitioner was sentenced to 11 years imprisonment. Petitioner was sentenced to the low term of 3 years for rape of an unconscious woman with that term being doubled pursuant to Cal. Penal Code § 667(e)(1) because defendant admitted he had been convicted of assault with a deadly weapon in 1991. ECF No. 11-5 at 20 & 35. Five additional years were added pursuant to § 667(a)(1) also due to petitioner's assault with a deadly weapon conviction. Id. Petitioner claims the trial court abused its discretion in imposing this sentence by not adequately considering mitigating factors.

/////

/////

---

[4] The court notes that before the court of appeal, petitioner challenged the admissibility of the DNA evidence as a violation of due process. ECF No. 11-5 at 23-28. While petitioner argues concerning the value of the DNA evidence, he makes no specific argument that admission of the evidence violates some aspect of federal law.

Whether the trial court abused its discretion at sentencing is a matter of California law. Since a petition for a writ of habeas corpus under 28 U.S.C. § 2254 can only be granted for a violation of federal law, relief can not be granted as to petitioner's sentencing claim.

### C. Telephone Call and "Adoptive Admission" Instruction

Petitioner makes a claim related to the phone call described above between petitioner and the victim. Petitioner asserts that "[t]he pretext call was fabricated by the Detective, and was a method of interrogation to circumvent and prevent request of counsel and due process." However, petitioner fails to point to anything suggesting that the phone call itself or admission of parts of the call into evidence amount to a violation of any federal right.

Petitioner also argues the jury was improperly instructed as to an "adoptive admission" based upon the call. At trial, jurors were instructed as follows:

> If you conclude that someone made a statement outside of court that accused the defendant of the crime and the defendant did not deny it, you must decide whether each of the following is true:
>
> 1. The statement was made to the defendant or made in his presence;
>
> 2. The defendant heard and understood the statement;
>
> 3. The defendant would, under all the circumstances, naturally have denied the statement if he thought it was true;
>
> AND
>
> 4. The defendant could have denied it but did not.
>
> If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true.
>
> If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose.

ECF 12-16 at 32-33.

Again, whether this instruction was given in violation of California law is immaterial as a violation of California law alone does not provide a basis for federal habeas relief. 28 U.S.C. § 2254(a). Petitioner seems to suggest that the instruction implies that petitioner made certain admissions where he did not, but that is not the case. The instruction did not tell jurors they had to find admissions under certain circumstances. Rather, the import of the instruction was that,

unless certain conditions were met, a statement made in the defendant's presence and defendant's response to that statement (including a lack of a response) could not be considered at all. Accordingly, this instruction protected petitioner rather than prejudicing his case, and did not deprive petitioner of a fair trial as he suggests.

Furthermore, the last reasoned decision concerning petitioner's claim was issued by the California Court of Appeal. ECF No. 11-5 at 31-36. The Court of Appeal's rejection of the claim is not contrary to Supreme Court precedent, it does not involve an unreasonable application of Supreme Court precedent, and it is not based upon an unreasonable determination of the facts. Accordingly, habeas relief is precluded under 28 U.S.C. § 2254(d).

## IV. Conclusion

For all of the foregoing reasons, petitioner's petition for a writ of habeas corpus will be denied.

In accordance with the above, IT IS HEREBY ORDERED that:

1. Petitioner's petition for a writ of habeas corpus (ECF No. 1) is denied;

2. This case be closed; and

3. The court declines to issue a certificate of appealability as referenced in 28 U.S.C. § 2253.

Dated:  March 31, 2021

_/s/ Carolyn K. Delaney_
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
sori12181015.157